IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RENSSELAER POLYTECHNIC
INSTITUTE and CF DYNAMIC
ADVANCES LLC,

                Plaintiffs,          Civil Action No.
                                    1:18-CV-0549 (BKS/CFH)

      v.

AMAZON.COM, INC.,

                Defendant.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFFS:

ROBINS KAPLAN LLP           BRYAN J. VOGEL, ESQ.
399 Park Avenue, Suite 3600     DANIELLE ROSENTHAL, ESQ.
New York, NY 10022

ROBINS KAPLAN LLP           CHRISTOPHER A. SEIDL, ESQ.
2800 LaSalle Plaza            TAYLOR MOORE-WILLIS, ESQ.
800 LaSalle Avenue           MARY PHENG, ESQ.
Minneapolis, MN 55402       SHUI LI, ESQ.

ROBINS KAPLAN LLP           LI ZHU, ESQ.
2440 West El Camino Real     CHRISTINE S. YUN SAUER, ESQ.
Suite 100
Mountain View, CA 94040

<u>FOR DEFENDANT</u>:

HANCOCK ESTABROOK, LLP                    JOHN G. POWERS, ESQ.
1800 AXA Tower I                          JAMES P. YOUNGS, ESQ.
100 Madison Street
Syracuse, NY 13202

KNOBBE MARTENS, OLSON &                   JOSEPH R. RE, ESQ.
BEAR, LLP                                 JOSEPH S. CIANFRANI, ESQ.
2040 Main Street, 14th Floor              JEREMY A. ANAPOL, ESQ.
Irvine, CA 92614

KNOBBE MARTENS, OLSON &                   COLIN B. HEIDEMAN, ESQ.
BEAR, LLP
925 Fourth Avenue, Suite 2500
Seattle, WA 98104

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a patent infringement action brought by plaintiffs Rensselaer

Polytechnic Institute ("RPI"), the owner of the patent in suit, and CF

Dynamic Advances, LLC ("CF Dynamic Advances"), which claims to be an

exclusive licensee under the patent, against defendant Amazon.com, Inc.

("Amazon"). Plaintiffs allege that certain of Amazon's products and

services infringe upon claims contained within the patent at issue.

Following an unsuccessful effort to have the case transferred to the

Western District of Washington, where Amazon is headquartered,

defendant now moves for dismissal of plaintiffs' complaint, arguing that CF

2

Dynamic Advances lacks standing to assert the infringement claims now

raised. Alternatively, Amazon requests that the action be stayed and held

in abeyance pending resolution of a suit filed in Texas state court in which,

according to Amazon, that court will address whether CF Dynamic

Advances is an exclusive licensee with standing to bring this patent

infringement action.

For the reasons set forth below, I recommend that the pending

motion, which has been referred to me for the issuance of a report and

recommendation, be denied.

I.    BACKGROUND

The infringement claims asserted in this action arise under United

States Patent No. 7,177,798 ("'798 Patent"), issued on February 13, 2007,

and entitled "Natural Language Interface Using Constrained Intermediate

Dictionary of Results." Dkt. No. 1 at 9; Dkt. No. 1-1 at 2. The '798 Patent

lists Dr. Cheng Hsu, a professor at RPI, and Dr. Veera Boonjing, who

teaches in Thailand, as the inventors, and RPI as the assignee of all rights

under the patent. Dkt. No. 1 at 10; Dkt. No. 1-1 at 2. The '798 Patent

discloses an innovative method of processing a natural language input

query provided by a user, utilizing searches of language-based databases

and transforming the input into a format that can be employed to access

3

and query various databases.. Dkt. No. 1 at 11-12; Dkt. No. 1-1 at 1. In their complaint, plaintiffs allege that certain of Amazon's products and services, including its Alexa Voice Software and Alexa-enabled devices, make unauthorized use of the '798 Patent technology. Dkt. No. 1 at 14-15. Specifically, they claim that Amazon's products infringe the patent "by at least employing a voice-based command system that allows the user to ask questions or provide commands for performing tasks using speech." *Id.* at 15.

CF Dynamic Advances contends that it has succeeded to the role of exclusive licensee under the '798 Patent, with the requisite standing to enforce the patent. Amazon counters that careful consideration of documents associated with a complex series of transactions reflects that efforts to assign exclusive license rights to the '798 Patent to CF Dynamic Advances were legally ineffective. A description of the documents submitted by the parties regarding the various potentially relevant transactions is set forth below.[1]

All rights under the '798 Patent were assigned by the inventors to RPI pursuant to an agreement dated September 14, 2001. Dkt. Nos. 89-2,

---

[1]    For ease of reference, the documents referenced herein are listed in the Appendix to this report and recommendation.

4

92-1. RPI, in turn, issued an exclusive license ("RPI Exclusive License") under the '798 Patent to Dynamic Advances on December 16, 2011. [2] Dkt. Nos. 89-3, 92-2. The RPI Exclusive License was later amended on October 18, 2016 ("Amended RPI Exclusive License"). Dkt. No. 92-3. The parties represent that, at the time the original RPI Exclusive License was executed, Dynamic Advances was owned by TechDev Holdings, LLC ("TechDev"), a Texas limited liability company, and the Spangenberg Family Foundation for the Benefit of Children's Healthcare and Education ("SFF"), a charitable foundation located in Texas. Dkt. No. 89-20 at 6; Dkt. No. 91 at 9. TechDev and SFF are collectively referred to as the "Spangenberg Entities" in this report and recommendation.

On May 2, 2014, the Spangenberg Entities sold Dynamic Advances to Marathon Patent Group, Inc. ("Marathon"). Dkt. Nos. 89-4, 92-7. To effectuate that sale, the Spangenberg Entities and Marathon entered into the Dynamic Advances Purchase Agreement ("DA Purchase Agreement"). *Id.* On the same date, the Spangenberg Entities and Marathon also executed a Pay Proceeds Agreement ("PPA"), which set forth the terms of payment owed by Marathon to the Spangenberg Entities for the sale of

---

[2]    According to the parties, despite the strong similarity in names, there is no affiliation between Dynamic Advances and CF Dynamic Advances.

5

Dynamic Advances.[3] Dkt. Nos. 89-5, 92-8. The DA Purchase Agreement

included, in relevant part, the following restrictive provision:

> [N]one of Marathon, DAA or Dynamic may grant or
> assign any rights or delegate any duties under this
> Agreement to any Third Party (including by way of a
> 'change of control') or may sell, transfer, or spin-off
> any of the Interests in Dynamic or any of its material
> assets, including the Patents, without the prior
> written consent of [the Spangenberg Entities].

Dkt. No. 89-4 at 15; Dkt. No. 92-7 at 15. The PPA included, in

relevant part, the following anti-sale provision:

> Marathon will not, directly or indirectly, sell or permit
> either Dynamic, Sarif or Liquidity to sell[ the '798
> Patent rights] without the written consent of Seller.

Dkt. No. 89-5 at 4; Dkt. No. 92-8 at 4.

On January 29, 2015, Marathon obtained a loan from DBD Credit

Funding, LLC ("DBD"), and entered into a Revenue Sharing and Securities

Purchase Agreement ("RSSPA") in connection with the loan. Dkt. Nos. 89-

6, 92-9. On the same date, Marathon and DBD also executed a "Security

---

3    The PPA also set forth the terms of payment owed by Marathon to another
entity, Granicus IP, LLC ("Granicus"), in conjunction with the sale to Marathon of
interests in IP Liquidity Ventures by Granicus and SFF. Dkt. No. 89-5 at 2; Dkt. No. 92-
8 at 2. Similarly, the PPA further outlined the terms of payment owed by Marathon to
TechDev in conjunction with the sale of interests in Sarif Biomedical by TechDev. *Id.*
While the PPA set forth the terms of payment required from Marathon to the
Spangenberg Entities and Granicus for the sale of Dynamic Advances, Liquidity, and
Sarif, the DA Purchase Agreement only transferred Dynamic Advances from the
Spangenberg Entities to Marathon.

Agreement" and a "Patent Security Agreement," both of which are related to the RSSPA. Dkt. Nos. 89-7, 92-10, 92-11. The Patent Security Agreement granted DBD "a lien on a security interest in and to all of [Marathon's] right, title and interest in, to and under" Marathon's patents, including the '798 Patent. Dkt. No. 92-11 at 5. The Security Agreement also granted to DBD the right to "sell, assign, lease, license (on an exclusive or non-exclusive basis) or otherwise dispose of" the '798 Patent (and several other patents), and the "right (but not the obligation) to bring suit or otherwise commence any action or proceeding . . . to enforce any Patents," including the '798 Patent. Dkt. No. 89-7 at 22, 24; Dkt. No. 92-10 at 22, 24. On January 27, 2015, two days before the execution of the RSSPA, Security Agreement, and Patent Security Agreement, the Spangenberg Entities consented to the execution of "the RSSPA and related documents." Dkt. No. 92-12 at 2. DBD's security interest in the '798 Patent rights was subsequently recorded in the Patent and Trademark Office ("PTO") on February 2, 2015. Dkt. No. 92-11.

On January 10, 2017, Marathon and DBD restructured their relationship and executed an Amended and Restated RSSPA,[4] as well as

---

[4]     Marathon and DBD later entered into a "First Amendment to Amended and Restated [RSSPA]" on August 3, 2017.  Dkt. No. 92-16.

a Security Agreement Supplement and a new Patent Security Agreement. Dkt. Nos. 92-13–92-15. The DBD security interest effectuated pursuant to those agreements was duly recorded in the PTO on January 11, 2017. Dkt. No. 92-15.

On September 29, 2017, RPI and Dynamic Advances executed a First Amendment to the Amended RPI Exclusive License.  Dkt. No. 92-4. In accordance with that agreement, RPI consented to the assignment of an exclusive license to the '798 Patent to an "SPE" or "special purpose entity" – a reference to CF Dynamic Advances as DBD's designee. *Id.* Dynamic Advances and CF Dynamic Advances subsequently executed an Assignment of Exclusive License Agreement ("AELA") on October 20, 2017, providing for the transfer of the Amended RPI Exclusive License from Dynamic Advances to CF Dynamic Advances. Dkt. No. 92-6.

II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on May 8, 2018. Dkt. No. 1. In response to their complaint, Amazon filed a motion on July 23, 2018, requesting that the case be transferred to the Western District of Washington. Dkt. No. 34. On August 7, 2019, District Judge Brenda K. Sannes issued a memorandum-decision and order denying Amazon's transfer motion. Dkt. No. 81.

Following the issuance of that decision, Amazon filed an answer generally denying plaintiff's infringement allegations, interposing several defenses, and asserting counterclaims seeking a declaratory judgment of non-infringement, patent invalidity, and patent unenforceability. Dkt. No. 82. Plaintiffs filed their answer to Amazon's counterclaims on September 11, 2019. Dkt. No. 85.

On October 3, 2019, Amazon again moved for dismissal of plaintiffs' complaint, on this occasion pursuant to Rules 12(b)(1) and 12(h) of the Federal Rules of Civil Procedure, arguing that CF Dynamic Advances lacks standing in the action. Dkt. No. 89. In support of its motion, Amazon contends that CF Dynamic Advances does not hold an exclusive license under the '798 Patent, and therefore lacks standing to assert the infringement claims now before the court. *See generally* Dkt. No. 89-20. Plaintiffs responded in opposition to Amazon's motion on October 28, 2019, Dkt. Nos. 91-92, and Amazon subsequently submitted a reply on November 7, 2018, Dkt. No. 93.[5] Oral argument was conducted in connection with Amazon's motion on January 21, 2020, at which time decision was reserved. The motion, which is now fully briefed and ripe for

---

[5]    On February 14, 2020, CF Dynamic Advances submitted a supplemental letter to the court in connection with the pending motion. Dkt. No. 101. Amazon was afforded an opportunity to address the contents of that letter, but did not do so. Dkt. No. 102.

determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Dkt. No. 96.

III.    DISCUSSION

A.    Abstention

CF Dynamic Advances and DBD commenced a proceeding (the "Texas Action") against the Spangenberg Entities in Texas District Court, Dallas County, on or about July 2, 2019, more than a year after CF Dynamic Advances and RPI filed this action. Dkt. No. 89-15. In their petition in that proceeding, CF Dynamic Advances and DBD have requested a declaratory judgment finding that they have the right to enforce the '798 Patent. *Id.* at 2, 17. As one of the alternative forms of relief sought in its motion, Amazon asks the court to stay this case pending adjudication of the Texas Action on the basis of the abstention principles taught in *Colorado R. Water Conservation Dist. v. United States* ("*Colorado River*"), 424 U.S. 800 (1976).

1.    Governing Legal Standard

Under appropriate circumstances, a federal court may abstain from acting in a matter before it in deference to a concurrent state court action. *Colorado River*, 424 U.S. at 814. It is well-established, however, that "abstention from the exercise of federal jurisdiction is the exception, not

10

the rule." *Id.* at 813. Abstention applies "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* (internal quotation marks omitted). The Supreme Court has explained that, "for reasons of wise judicial administration," a district court may stay or dismiss a federal action "due to the presence of a concurrent state proceeding." *Id.* The Court further expounded upon this abstention doctrine in *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). *De Cisneros v. Younger*, 871 F.3d 305, 307 (2d Cir. 1989).

The Second Circuit has counselled that when deciding whether to exercise its discretion to invoke the *Colorado River* abstention doctrine in favor of a parallel state court action, a district court should consider the following factors:

> (1) assumption of jurisdiction over a *res*; (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights.

*De Cisneros*, 871 F.2d at 307 (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 15-16). While these factors are relevant to the abstention inquiry, "the decision whether to dismiss a federal action . . . does not rest on a mechanical checklist, but on a careful balancing of the important factors as

they apply in a given case, with the balance heavily weighted in favor of the exercise of [federal] jurisdiction." *Moses H. Cone Mem'l Hosp.*, 424 U.S. at 16; *accord, De Cisneros*, 871 F.2d at 307.

2.    Analysis

At first blush there is a certain appeal to Amazon's abstention argument. Federal Rule of Civil Procedure 1 requires that the Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Litigating whether CF Dynamic Advances holds the right to enforce the '798 Patent in two separate actions would seemingly run afoul of that rule. Two considerations, however, counsel against recommending that the court stay this action.

It is true, as Amazon argues, that if the Texas court determines that CF Dynamic Advances is not the exclusive licensee to the '798 Patent, that determination would collaterally estop CF Dynamic Advances from relitigating the issue in this case. The converse, however, is not true. Amazon is not a party to the Texas Action. Accordingly, if CF Dynamic Advances succeeds in obtaining a ruling that it is the exclusive licensee to the '798 Patent in that case, the result would not bind Amazon, and

12

Amazon could actively relitigate CF Dynamic Advances' right to enforce the '798 Patent in this case. Accordingly, it is not at all clear that the interests of judicial economy and Rule 1 would be served in abstaining and staying this matter until the Texas Action is concluded.

In addition, although their position on the issue has been somewhat fluid, the record before the court reflects that, in the Texas Action, the Spangenberg Entities may not be disputing that CF Dynamic Advances and DBD own the rights to enforce the '798 Patent, and that instead, the Texas Action centers upon payments owed to the Spangenberg Entities. As a point of background, the Texas Action was preceded by commencement of a nearly identical declaratory judgment action filed by CF Dynamic Advances and DBD against the Spangenberg Entities in New York State Supreme Court, New York County (the "New York Action"). Dkt. Nos. 89-11. The New York Action was dismissed for lack of personal jurisdiction on July 2, 2019, Dkt. No. 89-14, and CF Dynamic Advances and DBD filed the Texas Action on the same date. According to plaintiffs, in the New York Action, the Spangenberg Entities filed an arbitration demand in which they stated they do not dispute CF Dynamic Advances' and DBD's rights to enforce the '798 Patent. Dkt. No. 92-18 at 12. In addition, in a letter to the New York State Supreme Court, counsel for the

Spangenberg Entities stated that those parties "[d]o not challenge or contest [CF Dynamic Advances' or DBD's] standing to bring suit asserting the '798 Patent by virtue of the exclusive license agreement with [RPI]," and "[d]o not challenge ownership or title concerning [CF Dynamic Advances' or DBD's] rights to assert the '798 Patent." Dkt. No. 92-19 at 2-3. Standing alone, those representations by counsel for the Spangenberg Entities suggest that the Texas Action will ultimately yield a finding in favor of CF Dynamic Advances on the standing issue, which, as was discussed above, would not estop Amazon from relitigating the question in this suit.

Notwithstanding those earlier representations on behalf of the Spangenberg Entities, in their recent letter to the court following oral argument concerning Amazon's pending motion to dismiss, plaintiffs have suggested that the Spangenberg Entities, represented by new counsel, may now be contesting ownership of the '798 Patent in the Texas Action after all. Dkt. No. 101. None of the communications suggesting that the Spangenberg Entities are contesting ownership, however, are in the record before this court.

In any event, although there may well be overlap between this case and the Texas Action, with at least some potential for conflicting results, that alone does not represent an exceptional circumstance warranting

14

abstention. *See Colorado River*, 424 U.S. at 816 ("[T]he mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction.").

In sum, I do not find that the interests of judicial economy would be served by staying this action, nor do I find that consideration of the relevant factors informing the decision of whether to abstain under *Colorado River*, particularly the need to protect plaintiffs' right to adjudication of their claims in this court in the face of alleged ongoing infringement by Amazon, favor the granting of Amazon's motion. Accordingly, I recommend against staying this action.

B.   Standing

Amazon contends that, in the event the court does not stay this action, plaintiffs' complaint should be dismissed on the ground that the relevant documents reflect that CF Dynamic Advances is not the exclusive licensee under the '798 Patent with standing to assert infringement claims now raised. CF Dynamic Advances disputes that claim and asserts that the record reflects it has, indeed, succeeded to the status of exclusive licensee under the patent.

1.    Governing Legal Standard

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see also Sicom Sys., Ltd. V. Agilent Techs., Inc.*, 427 F.3d 971, 975 (Fed. Cir. 2005). Arising from the case and controversy requirement of Article III of the Constitution, "[i]n essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013).

To establish standing, (1) "the plaintiff must have suffered an injury in fact"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted); *accord, MHL TEK, LLC v. Nissan Motor Co.*, 655 F.3d 1266, 1273-74 (Fed. Cir. 2011). As the party asserting infringement claims, the plaintiffs bear the burden of establishing standing.

*MHL TEK, LLC*, 655 F.3d at 1274; *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1338 (Fed. Cir. 2007) (citing *Sicom Sys., Ltd.*, 427 F.3d at 976).

"Since the patent statutes give rise to the right to sue others for patent infringement, they also define the nature and source of the infringement claim and determine the party that is entitled to judicial relief." *Morrow*, 499 F.3d at 1339; *see also Intellectual Prop. Develop., Inc. v. TCI Cablevision of Calif., Inc.*, 248 F.3d 1333, 1345 (Fed Cir. 2001) ("Standing in a patent infringement case is derived from the Patent Act."). Section 281 of Title 35 of the United States Code provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *Morrow*, 499 F.3d at 1339. The term "patentee" is defined as including "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d); *Morrow*, 499 F.3d at 1339. "The successor in title is the party holding *legal title* to the patent." *Morrow*, 499 F.3d at 1399 (internal quotation marks, alteration omitted) (emphasis in original). "In an action for patent infringement, the party holding the exclusionary rights to the patent suffers legal injury in fact under the statute." *MHL TEK, LLC*, 655 F.3d at 1274 (citing *Morrow*, 499 F.3d at 1339); *see also Sicom Sys., Ltd.*, 427 F.3d at 976. Thus, CF Dynamic Advances has standing to sue Amazon for infringement if it can prove its

status as an exclusive licensee under the '798 Patent.[6] *Intellectual Prop. Develop., Inc.*, 248 F.3d at 1346-57; *see also Morrow*, 499 F.3d at 1340.

The question of whether CF Dynamic Advances has assumed the rights of Dynamic Advances to enforce the '798 Patent as an exclusive licensee implicates a series of transactions. The documents associated with those transactions are included in the record now before the court, and there is no controversy concerning their authenticity. Rather, the parties' dispute centers upon the legal significance of those documents for purposes of determining whether CF Dynamic Advances has standing in this action. Because that question turns upon the interpretation of contract documents, it represents a question that can be determined as a matter of law by the court. *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76 (2d Cir. 2002).

### 2. Analysis

Amazon presents two main arguments for why the Amended RPI Exclusive License did not transfer from Dynamic Advances to CF Dynamic Advances pursuant to the AELA. I will address both arguments separately below.

---

[6]    The Amended RPI Exclusive License confers upon the licensee the exclusive right to prosecute all claims of infringement under the '798 Patent. Dkt. No. 92-3 at 5.

a.    <u>Security Interest</u>

In its opening memorandum, Amazon presumed that the transfer of exclusive rights to the '798 Patent was effectuated through enforcement of DBD's security interest.[7] *See* Dkt. No. 89-20 at 12. In support of that argument, Amazon cited to an allegation by CF Dynamic Advances in the Texas Action to the effect that the transfer was "as fulfillment of DBD's security interest." *Id.* (citing Dkt. No. 89-15 at 10). Amazon contends that the security interest in favor of DBD never attached to the rights under the '798 Patent, and further that, even if it did, there is no record evidence that Marathon defaulted on its loan obligations or that DBD enforced the security interest through assignment to CF Dynamic Advances, as DBD's designee. Dkt. No. 89-20 at 12-14; Dkt. No. 93 at 10-11.

It is true, as Amazon argues, that there is no evidence in the record that the security interest arising under the Security Agreement between Marathon and DBD was ever enforced, nor is there proof that Marathon defaulted on the underlying loan, thus permitting enforcement of the corresponding security interest. According to Amazon, absent a default on the loan, foreclosure on the loan and enforcement of the security interest

---

[7]    At the time Amazon's opening memorandum was authored, plaintiffs had not yet produced the AELA, which assigned the Amended RPI Exclusive License from Dynamic Advances to CF Dynamic Advances. Dkt. No. 89-20 at 11.

by DBD was not legally permissible. During the recent motion hearing, CF Dynamic Advances asserted that, because the loan was not being repaid, nor could Marathon repay it, instead of Marathon technically defaulting on the loan and requiring DBD to go through the process of foreclosing on its security interest, DBD in essence informally enforced the security interest by restructuring its loan with Marathon to include a provision transferring the rights to the '798 Patent to an SPE, a reference to CF Dynamic Advances as DBD's designee, in partial fulfillment of the loan obligation.

Any dispute that exists between the parties following CF Dynamic Advances' admission at oral argument that Marathon did not default on the loan from DBD is resolved by the Security Agreement in favor of Amazon. Section 7.1 of the Security Agreement provides DBD remedies for exercising its rights to the collateral under the loan (including the rights to the '798 Patent) only in the event of a default. Dkt. No. 89-7 at 21-22; Dkt. No. 92-10 at 21-22. In particular, that section, entitled "Remedies," includes the following provision:

> **7.1. Generally**
>
> (a)    If any Event of Default shall have occurred and be continuing, Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of Collateral Agent on default under the [Uniform Commercial Code ("UCC")] (whether or not the

UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise. . . .

*Id.* In relevant part Section 9-601 of the UCC provides as follows:

> (a) **[Rights of secured party after default.]** After default, a secured party has the rights provided in this part and, excepted as otherwise provided in Section 9-602, those provided by agreement of the parties. A secured party:
>> (1) may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure . . . .

UCC § 9-601(a).

As CF Dynamic Advances concedes, Marathon did not technically default on the loan with DBD and, accordingly, DBD could not have formally enforced any security interest under the loan. While restructuring the loan may have been the wisest commercial and business course for Marathon and DBD under the circumstances, the execution of the Amended and Restated RSSPA did not result in, or stem from, a default of the original loan, which would have permitted DBD to exercise its rights to enforce the security interest and transfer the rights to the '798 Patent to CF Dynamic Advances. Accordingly, because there was no default on the loan, DBD never enforced the security interest under that loan and

therefore any argument that the Amended RPI Exclusive License was

transferred to CF Dynamic Advances pursuant to the security interest fails.

This flawed argument, however, is not fatal to CF Dynamic's claim of

standing. Its claim of entitlement stems directly from the AELA, executed

on October 20, 2017, between Dynamic Advances and CF Dynamic

Advances. Dkt. No. 92-6. That agreement is separate and apart from the

security interest in favor of DBD, and does not purport to depend upon the

validity of the Security Agreement. Accordingly, Amazon's contention that

the security interest did not properly attach to the '798 Patent rights, and in

any event was not properly enforced, is legally irrelevant.

b.    <u>No Consent to Assignment</u>

Amazon's second argument in support of its contention that CF

Dynamic Advances does not hold exclusive rights to the '798 Patent under

the Amended RPI Exclusive License is based upon the anti-sale

provisions within the DA Purchase Agreement and the PPA. Amazon

argues that setting aside the security interest issue altogether, any transfer

of the Amended RPI Exclusive License by Dynamic Advances to CF

Dynamic Advances pursuant to the AELA was a sale and, therefore, was

invalid in the absence of separate prior consent by the Spangenberg

Entities and Granicus pursuant to section 9.3 of the DA Purchase

22

Agreement and section 1.2 of the PPA. Under Texas state law – the law that applies, according to Amazon – absent separate consent as required under the DA Purchase Agreement and PPA, those transfer restrictions are enforceable, and any transfers made in violation of those restrictions are void.

CF Dynamic Advances offers several arguments in response. First, it contends that those provisions only prohibit sales, and the AELA was not a traditional sale but rather an assignment pursuant to the Amended and Restated RSSPA and Security Agreement. Second, it argues that, while the Spangenberg Entities were required under section 9.3 of the DA Purchase Agreement to approve of the assignment of the Amended RPI Exclusive License, they did so when they consented to the loan under the RSSPA, Security Agreement, and Patent Security Agreement. Third, because the AELA was not a traditional sale, Marathon was under no obligation to obtain consent from Granicus pursuant to section 1.2 of the PPA and, in any event, Granicus does not constitute a "Seller" under that section. In addition, CF Dynamic Advances argues that even if the restrictive provisions set forth in the DA Purchase Agreement and PPA are valid and were violated, New York law should apply, and in any event under both Texas and New York law, while a sale or transfer made in

23

violation of an anti-assignment provision may be enforced by an injured party for money damages, the provision does not invalidate the sale or transfer itself.

In an effort to simplify the many issues raised by the parties, I have assumed – without deciding – that Amazon is correct that (1) the AELA was a sale,[8] (2) consent was necessary from the Spangenberg Entities and Grancius prior to the execution of the AELA pursuant to the DA Purchase Agreement and PPA, (3) consent was not given by either the Spangenberg Entities or Grancius, and (4) Texas law applies to whether the consent provisions in the DA Purchase Agreement and PPA invalidate the AELA. Notwithstanding the foregoing presumed facts, there are multiple reasons why I recommend a finding that AELA is valid and gives CF Dynamic Advances standing to enforce the '798 Patent in this action.

The analysis begins with an examination of Texas law concerning anti-assignment and consent provisions. Amazon cites to three cases in support of its contention that, under Texas law, consent provisions are enforced and any transfer made in violation of an anti-assignment

---

[8]     Virtually every reference to the AELA within the agreement itself characterizes it as an "assignment." *See, e.g.*, Dkt. No. 92-6 at 2 (document entitled "ASSIGNMENT OF EXCLUSIVE LICENSE AGREEMENT" and further stating "THIS ASSIGNMENT OF EXCLUSIVE LICENSE AGREEMENT (this 'Assignment') . . . ." (emphasis in original)).

provision is void. *See Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 124 (5th Cir. 1987) ("Texas law permits the enforcement of no-assignment clauses in insurance policies."); *Island Recreational Dev. Corp. v. Republic of Texas Sav'n*, 710 S.W.2d 551, 556 (Tex. 1986) ("Further, by the terms of [the anti-assignment provision], the letter of commitment was not assignable without Republic's consent. Thus, any attempted assignment. . . would be of no force and effect."); *Tex. Dev. Co. v. Exxon Mobil Corp.* 119 S.W.3d 875, 880-81 (Tex. App. 2003) (relying on *Island Recreational Dev. Corp.* and concluding that Exxon's anti-assignment clause was enforceable).

During oral argument, CF Dynamic Advances attempted to undermine Amazon's argument by insisting that the Texas Supreme Court's statement in *Island Recreational Dev. Corp.* concerning the enforceability of the anti-assignment provision at issue was dicta and should not serve as controlling precedent. In support of its position, CF Dynamic Advances relies principally upon *Donnelly v. McKinnon*, 688 S.W.2d 612 (Tex. App. 1985). In *Donnelly*, which was decided one year prior to *Island Recreational Dev. Corp.*, the Texas Court of Appeals applied the Restatement (Second) of Contracts § 322, which provides, in pertinent part, that "[a] contract term prohibiting assignment of rights under

the contract . . . gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective." Restatement (Second) of Contracts § 322(2)(b) (1981); *see also Donnelly*, 688 S.W.2d at 615.

After careful review of the parties' arguments and Texas state law on this issue I conclude that, as Amazon argues, under Texas law the type of consent provisions set forth in section 9.3 of the DA Purchase Agreement[9] and section 1.2 of the PPA[10] will be enforced and can void a transfer made in violation of such a restriction, and that *Donnelly* has effectively been overruled. Specifically, it appears clear that Texas courts will invalidate a transfer of rights made pursuant to an assignment of a contract that expressly forbids assignments. *See, e.g., Island Recreational Dev. Corp.*, 710 S.W.2d at 553; *Safeco Ins. Co. of Am. V. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 919 (Tex. App. 2018); *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721 (Tex. App. 2004); *Tex. Dev. Co.*, 119 S.W.3d at 880-81.

The conclusion that Texas state law enforces anti-assignment provisions, however, does not end the analysis because each of the cases

---

[9]    *See* Dkt. No. 89-4 at 15; Dkt. No. 92-7 at 15.

[10]    *See* Dkt. No. 89-5 at 4; Dkt. No. 92-8 at 4.

26

cited by Amazon is materially distinguishable. At issue in those cases

relied upon by Amazon were anti-assignment clauses found within the

agreements that were being assigned; they did not involve the

circumstances now presented, where the relevant consent provisions were

included within wholly separate agreements between different parties.

For example, in *Island Recreational Dev. Corp.*, a development

company ("Island") contracted with Republic Bank of Texas and Savings

Association and Bankers Capital Corporation (the "Banks") for a loan

under a "loan commitment letter." *Island Recreational Dev. Corp.*, 710

S.W.2d at 553. The loan commitment letter included the following anti-

assignment provision:

> 15. *Transfer of Commitment*
> This commitment is nontransferable or
> assignable to any other individual, corporation
> or entity unless specifically approved in writing
> by [one of the Banks].

*Id.* Island thereafter attempted to assign the loan commitment letter as

collateral security to another bank to arrange interim financing in the

underlying construction project without first securing the required consent.

*Id.* at 556. Ultimately, Island did not satisfy its obligations under the loan

commitment letter in a timely manner and, accordingly, the Banks refused

to honor their commitments under the loan. *Id.* at 553. Island sued the

27

Banks to enforce the contract. *Id.* After the Banks discovered the assignment of the loan to the other bank, they argued that Island had no interest in the loan because it had breached the anti-assignment provision and therefore the Banks were under no obligation to perform under the contract. *See Republic of Tex. Sav. Ass'n v. Island Recreational Dev. Corp.*, 680 S.W.2d 588, 594 (Tex. App. 1984). The Texas Supreme Court, however, rejected this argument after concluding that the anti-assignment provision invalidated any purported assignment of the loan commitment letter to the other bank. *Island Recreational Dev. Corp.*, 710 S.W.2d at 556. As can be seen from the foregoing factual synopsis, the loan commitment letter in *Island Recreational Dev. Corp.* – the very document establishing the rights being assigned – contained the anti-assignment provision at issue. *See also Conoco, Inc.*, 819 F.2d at 124 (deciding that the plaintiff did not have standing to enforce the insurance contract because the plaintiff's basis for standing arose out of a purported assignment of the insurance contract that contained an anti-assignment provision).

The facts of *Island Recreational Dev. Corp.* and the facts of the case now before the court are materially distinguishable. The instrument that was assigned and that conveyed the rights giving CF Dynamic Advances

standing to enforce the '798 Patent is the Amended RPI Exclusive

License, and not the DA Purchase Agreement or the PPA – the two

agreements containing the consent provisions that Amazon seeks to

enforce. The only limiting language regarding consent in the Amended RPI

Exclusive License is a clause that requires the consent of RPI before

assignment of the exclusive license. *See* Dkt. No. 92-3 at 13 ("This

Agreement is binding upon and shall inure to the benefit of RPI, its

successors and assigns, but shall be personal to Licensee and assignable

by Licensee only to Licensee's Affiliates, without need for RPI's prior

consent, or otherwise with the written consent of RPI which shall be in the

sole discretion of RPI."). On September 29, 2017, RPI consented to a

transfer by Dynamic Advances of the Amended RPI Exclusive License to a

designee of DBD, in this case CF Dynamic Advances. Dkt. No. 92-4 at 2.

Accordingly, since the Amended RPI Exclusive License is the relevant

agreement to examine when determining whether the AELA constitutes a

valid assignment – because it is that document which purports to transfer

the exclusive license to CF Dynamic Advances – and inasmuch as there

has been no violation of the consent provision set forth in the Amended

RPI Exclusive License, the AELA is a valid and enforceable assignment

that conveyed the exclusive rights to the '798 Patent to CF Dynamic

Advances. To void a transfer of rights to CF Dynamic Advances based not upon a limitation contained within the document conferring the rights being assigned, but rather upon restrictions contained within documents to which the transferee, CF Dynamic Advances, was not a party, would yield a manifestly unfair result not required even under Texas law.[11]

I note, moreover, that regardless of whether the court examines the DA Purchase Agreement and PPA or the Amended RPI Exclusive License to determine whether the AELA violated any anti-assignment provisions, in either case Amazon is not a party to any of those agreements, and thus cannot enforce any rights or restrictions set forth in them. A third-party, such as Amazon, may enforce the provisions of a contract between other parties only if "the parties intended to secure a benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002).

---

[11] I note that, if the court finds that New York law applies and that it must look to the DA Purchase Agreement and the PPA to determine whether the AELA is valid, the AELA would be enforceable because the restrictive provisions within the DA Purchase Agreement and the PPA relied upon by Amazon do not contain language specifically voiding any agreement entered into without the requisite consents. *See Au New Haven, LLC v. YKK Corp.*, 210 F. Supp. 3d 549, 554-56 (S.D.N.Y. 2016) ("The rule adhered to in New York regarding contractual anti-assignment clauses is that, with limited exception, contractual provisions prohibiting assignments are treated as personal covenants. An assignment made in violation of a personal covenant prohibiting assignments is enforceable, although it does give rise to a damages action against the assignor. The limited exception is when the relevant provision of the contract contains clear, definite, and appropriate language declaring an assignment invalid." (citations, internal quotation marks, and alterations omitted)).

Amazon was not the party being protected by the consent provisions, and is not a third-party beneficiary to the DA Purchase Agreement, PPA, or the Amended RPI Exclusive License. Accordingly, Amazon is precluded from enforcing any restrictive provisions set forth in any of those agreements. *Cf. Farwah v. Prosperous Maritime Corp.*, 220 S.W.3d 585, 596 (Tex. App. 2007) ("Because the terms do not appear to apply to the Farwahs, and because there is no evidence that the term was intended for their benefit, we conclude that the consent-to-sue provision is not relevant to the question of whether a Texas court could exercise jurisdiction over the Farwahs' claims.").

In this regard, the protections afforded by the aforementioned consent provisions were for the benefit of the Spangenberg Entities, not Amazon. Even assuming that the Spangenberg Entities' consent to the original loan from DBD to Marathon does not satisfy the anti-assignment provisions, at best, it remains unclear whether the Spangenberg Entities acknowledge or dispute that CF Dynamic Advances holds the exclusive license to the '798 Patent. Dkt. No. 92-18 at 12; Dkt. No. 92-19 at 2-3; Dkt. No. 101. There is also no evidence in the record now before the court, however, that the Spangenberg Entities raised any timely objection to the assignment of the Amended RPI Exclusive License under the AELA. Such

31

inaction and silence clearly could give rise to a finding that they have

waived any right to enforce the anti-assignment provision in the DA

Purchase Agreement. *See Tex. Dev. Co.*, 119 S.W.3d at 884 (applying

waiver principles of contract law to the anti-assignment provision at issue);

*Safeco Ins. Co. of Am.*, 564 S.W.3d at 919 (concluding that, under Texas

law, anti-assignment provisions are enforceable "unless rendered

ineffective by a statute or through the application of contract law,"

including waiver, and that a party may waive through an express

renunciation of a right, or a "party's silence or inaction for a period of time

long enough [can] show an intention to yield the known right").[12]

---

[12]    With respect to the argument that Granicus' consent was also required prior to the execution of the AELA (assuming the AELA was a "sale"), the language set forth in section 1.2 of the PPA settles the parties' dispute. The relevant sentence in that provision forbids Marathon from selling (or allowing Dynamic Advances to sell) "any of the DL Assets[, including the '798 Patent,] without the written consent of *Seller*." Dkt. No. 89-5 at 4; Dkt. No. 92-8 at 4 (emphasis added). The terms "Seller" and "Sellers" are defined at the outset of the PPA as follows: "Granicus, TechDev and SFF are collectively referred to as the 'Sellers' and individually as a 'Seller[.]'" Dkt. No. 89-5 at 2; Dkt. No. 92-8 at 2. Because the last sentence in section 1.2 uses the singular "Seller" rather than the plural "Sellers," it is clearly a reference to the entity that sold the DL Assets subsequently being sold to Marathon. Under the DA Purchase Agreement, the Spangenberg Entities (*i.e.*, TechDev and SFF) sold Dynamic Advances (including the '798 Patent rights) to Marathon, and, therefore, the word "Seller" in section 1.2 of the PPA is a reference to the Spangenberg Entities. Had the contracting parties intended to require the consent of all three "Sellers" (*i.e.* TechDev, SFF, and Granicus) under the PPA, they could have used the word "Sellers" as defined under the PPA. Instead, the parties used the singular form of that word, which carries a separate meaning as set forth in the contract. Accordingly, Granicus' consent was not necessary prior to assignment of the Amended RPI Exclusive License pursuant to the AELA.

Based upon the foregoing, I recommend that the court reject Amazon's effort to invoke the restrictions set forth in the DA Purchase Agreement and PPA to void the transfer of rights under the '798 Patent to CF Dynamic Advances pursuant to the AELA.

IV.    SUMMARY AND RECOMMENDATION

The viability of plaintiffs' infringement claims in this action depends upon the status of CF Dynamic Advances as assignee of the Amended RPI Exclusive License to the '798 Patent. While that issue may have been placed before a court in the Texas Action, I recommend a finding that the interests of judicial economy would not be served by deferring to the court in that action, and that the *Colorado River* abstention doctrine does not require the court to do so. Turning to the merits of Amazon's dismissal motion, I recommend a finding that, through the relevant documents, as set forth above, CF Dynamic Advances does hold an exclusive license under the '798 Patent, and therefore has standing to bring the instant action. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss or, in the alternative, to stay this action (Dkt. No. 89) be DENIED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the Clerk of the court serve a copy of

this report and recommendation upon the parties in accordance with this

court's local rules.

Dated:    February 25, 2020
          Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

APPENDIX

| Date | Agreement Name | Parties to Agreement | ECF Dkt. No. |
|---|---|---|---|
| 9/14/01 | '798 Patent Assignment | Cheng Hsu and Veera Boonjing | 89-2; 92-1 |
| 12/16/11 | RPI Exclusive License | RPI and Dynamic Advances | 89-3; 92-2 |
| 5/2/14 | DA Purchase Agreement | Spangenberg Entities and Marathon | 89-4; 92-7 |
| 5/2/14 | PPA | Granicus, Spangenberg Entities, and Marathon | 89-5; 92-8 |
| 1/29/15 | RSSPA | Marathon and DBD | 89-6; 92-9 |
| 1/29/15 | Security Agreement | Marathon and DBD | 89-7; 92-10 |
| 1/29/15 | Patent Security Agreement | Marathon and DBD | 92-11 |
| 10/18/16 | Amended RPI Exclusive License | RPI and Dynamic Advances | 92-3 |
| 1/10/17 | Amended and Restated RSSPA | Marathon and DBD | 89-8; 92-13 |
| 1/10/17 | Security Agreement Supplement | Marathon and DBD | 92-14 |
| 1/10/17 | New Patent Security Agreement | Marathon and DBD | 92-15 |
| 8/3/17 | First Amendment to Amended and Restated RSSPA | Marathon and DBD | 89-9; 92-16 |
| 9/29/17 | First Amendment to Amended RPI Exclusive License | RPI and Dynamic Advances | 92-4 |
| 10/20/17 | AELA | Dynamic Advances and CF Dynamic Advances | 92-6 |