**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

RENSSELAER POLYTECHNIC INSTITUTE and CF
DYNAMIC ADVANCES LLC,

                                        Plaintiffs,

1:18-cv-549 (BKS/TWD)

v.

AMAZON.COM, INC.,

                                        Defendant.

---

**Appearances:**

*For Plaintiffs:*
Ronald S. Schutz
Cyrus A. Morton
Benjamen C. Linden
Francois Ecclesiaste
Navin Ramalingam
Robins Kaplan LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402

Annie Huang
Miles Finn
Robins Kaplan LLP
900 Third Avenue, Suite 1900
New York, NY 10022

Li Zhu
Robins Kaplan LLP
555 Twin Dolphin Drive, Suite 310
Redwood City, CA 94065

Lucas M. Walker
MoloLamkin LLP
600 New Hampshire Av. NW, Suite 500
Washington DC 20037

*For Defendant:*
John G. Powers
Hancock Estabrook, LLP

AXA Tower I, Suite 1800
100 Madison Street
Syracuse, NY 13202

Joseph R. Re
Jon W. Gurka
Jeremy A. Anapol
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614

Colin B. Heideman
Nathan D. Reeves
Knobbe, Martens, Olson & Bear, LLP
925 Fourth Avenue, Suite 2500
Seattle, WA 98104

Yanna S. Bouris
Knobbe Martens Olson & Bear
1925 Century Park East, Suite 400
Los Angeles, CA 90067

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiffs Rensselaer Polytechnic Institute ("RPI") and CF Dynamic Advances LLC ("CF Dynamic") bring this patent infringement action against Defendant Amazon.com, Inc. ("Amazon"). (Dkt. No. 1). Presently before the Court is Amazon's motion to dismiss for lack of Article III standing pursuant to Federal Rule of Civil Procedure 12(b)(1). (Dkt. No. 288). The parties have filed responsive briefing. (Dkt. Nos. 312, 324). The parties filed supplemental briefing in response to the Court's May 15, 2023 Order. (Dkt. Nos. 351, 355, 374). The Court heard oral argument on June 28, 2023. For the following reasons, Amazon's motion to dismiss is denied.

## II.      BACKGROUND

Amazon's argument that Plaintiffs lack standing in this matter relies on a series of transactions involving the asserted patent in this infringement action, United States Patent No. 7,177,798 (the "'798 Patent"). The '798 Patent issued on February 13, 2007 and lists Cheng Hsu and Veera Boonjing as the inventors and RPI as the assignee. (Dkt. No. 1-1, at 2; *see* Dkt. No. 89-2 (2001 assignment of all rights from the inventors to RPI)).

### A.      RPI Grants Exclusive License to Dynamic Advances

In December 2011, RPI granted the exclusive right to license the '798 Patent to Dynamic Advances, LLC[1] (the "RPI ELA"). (Dkt. No. 89-3 (Exclusive License Agreement dated December 16, 2011)). Specifically, RPI granted to Dynamic Advances "an exclusive license under the RPI Patent Rights to make, have made, use, import, put into use, distribute, sell and have sold Licensed Products and to practice the Licensed Method in the Territory during the term of this Agreement." (*Id.* at 4; *see also id.* at 3, 18 (defining "RPI Patent Rights" to include the '798 Patent)). RPI also granted to Dynamic Advances "the exclusive right to grant sublicenses to third parties." (*Id.* at 4). The RPI ELA provided that any such sublicense must "include all of the rights of and obligations due to RPI" and include certain specified provisions. (*Id.*). Further, "[e]ach sublicensee, and the form and substance of each sublicense, shall be subject to the prior written approval of RPI, in each case, which approval shall not be unreasonably withheld." (*Id.* at 5). The agreement provided that, upon its termination for any reason, "all sublicenses granted prior to such termination shall be assigned to RPI." (*Id.*).

The RPI ELA also provided that, in the event Dynamic Advances exercised its rights under the license or opted to sublicense or otherwise monetize the RPI Patent Rights, RPI was to

---

[1] There is no affiliation between Dynamic Advances, LLC and Plaintiff CF Dynamic.

receive twenty percent of "the gross cash consideration received by [Dynamic Advances] for the RPI Patent Rights." (*Id.*). Dynamic Advances was granted "the exclusive right to prosecute any and all infringements of any RPI Patent Rights following the exercise of the RPI Patent Rights by [Dynamic Advances], its Affiliates or sublicensees." (*Id.* at 6). However, RPI's "prior written consent" was required before Dynamic Advances "enter[ed] into settlements, stipulated judgments or other arrangements respecting such infringement." (*Id.*). If Dynamic Advances elected "not to prosecute any such infringement," it was required to "notify RPI in writing promptly," and RPI would then "have the right to prosecute such infringement on its own behalf." (*Id.*). If RPI prosecuted any infringement after Dynamic Advances elected not to, RPI would receive "any damages or other recovery incurred." (*Id.*). The parties agreed to "cooperate" with each other "in litigation proceedings instituted hereunder but at the expense of the party on account of whom suit is brought for out-of-pocket expenses." (*Id.* at 12). Litigation was to be "controlled by the party bringing the suit," but "[e]ach party may be represented by counsel of its choice at its own expense." (*Id.*). RPI also retained veto power over what parties were named "in the filing of any case naming one or more third parties" relating to the monetization efforts of the RPI Patent Rights. (*Id.* at 5).

**B.    Marathon Purchases Dynamic Advances and Obtains Funding from DBD Credit**

By sale agreement dated May 2, 2014, Dynamic Advances was sold to DA Acquisition LLC, a wholly owned subsidiary of Marathon Patent Group, Inc. ("Marathon"). (Dkt. No. 89-4). Although Dynamic Advances continued operating, the parties appear to agree that this transaction gave Marathon, by virtue of its ownership, control over Dynamic Advances's rights under the RPI ELA. (*See generally id.*; *id.* at 3 (noting that Dynamic Advances's rights are "subject in all cases to the terms and conditions of the applicable exclusive license pursuant to

which Dynamic holds its rights in such Patents, as applicable")). The sale agreement provided

that the RPI ELA, among other licenses, "shall remain in full force and effect, shall remain

binding on Dynamic and any successor or assignee of Dynamic or of the Patents or Patent Rights

and shall not be terminable by Dynamic or any successor or assignee of Dynamic or of the

Patents or Patent Rights." (*Id.* at 9).

On January 29, 2015, Marathon obtained a loan from DBD Credit Funding LLC ("DBD

Credit") which was governed by a Revenue Sharing and Securities Purchase Agreement

("RSSPA"). (Dkt. No. 89-6). To secure the funding, Marathon and its subsidiaries, including

Dynamic Advances, were required to "grant to [DBD Credit], for the benefit of the Secured

Parties, a non-exclusive, royalty free, license (including the right to grant sublicenses) with

respect to the Patents, which shall be evidenced by, and reflected in, the Patent License

Agreement." (*Id.* at 11–12; *see id.* at 54, 74 (defining "Patents" to include the '798 Patent)). The

parties agreed, however, that DBD Credit "shall only be entitled to use such license following

acceleration of the Note Obligations." (*Id.* at 12). As required by the RSSPA, Marathon and

DBD Credit simultaneously entered into a Patent License Agreement ("PLA") which provided:

> Subject to the terms and conditions herein and in the [RSSPA],
> Licensor hereby grants to Licensee a non-exclusive, transferrable,
> sub-licensable, divisible, irrevocable, fully paid-up, royalty-free,
> and worldwide license to the Licensed Patents, including, but not
> limited to, the rights to make, have made, market, use, sell, offer for
> sale, import, export and distribute the inventions disclosed in the
> Licensed Patents and otherwise exploit the Licensed Patents in any
> lawful manner in Licensee's sole and absolute discretion solely for
> the benefit of the Secured Parties ("**Patent License**"), provided that
> Licensee shall only use the Patent License following acceleration of
> the Note Obligations.

(Dkt. No. 358-3, at 3). DBD Credit did not have the right under the PLA to bring infringement

actions. (*Id.*).

### C.      RPI and Dynamic Advances Amend the RPI ELA

On October 18, 2016, RPI and Dynamic Advances entered into an Amended and Restated Exclusive License Agreement (the "Amended RPI ELA"). (Dkt. No. 92-3). RPI again "grant[ed] to [Dynamic Advances] an exclusive license under the RPI Patent Rights to make, have made, use, import, put into use, distribute, sell and have sold Licensed Products and to practice the Licensed Method in the Territory during the term of this Agreement." (*Id.* at 3). RPI also granted Dynamic Advances "the exclusive right to grant sublicenses to third parties . . . , provided RPI's written consent, which shall be in the *sole discretion* of RPI, is first obtained." (*Id.* at 4 (emphasis added)). Under the Amended RPI ELA, Dynamic Advances was required to "identify potential sublicensees to RPI," who then had thirty calendar days to "approve [Dynamic Advances] contacting any such potential sublicensee." (*Id.* ("Licensee will not contact a Potential Licensee without RPI's prior written approval.")). RPI's prior written approval, in its "sole discretion," was also required before Dynamic Advances "fil[ed] suit against a Potential Licensee." (*Id.*). Further, the "form and substance of each sublicense shall be subject to the prior written approval of RPI" in its "sole discretion," and RPI was required to "convey its approval or rejection" of the form and substance of each sublicense no later than five business days after notice thereof. (*Id.*). If Dynamic Advances did not receive RPI's "approval or rejection within such time period," RPI was "deemed to have consented to the form and substance of the sublicense." (*Id.*). In addition, under the Amended RPI ELA, RPI was entitled to a share of proceeds from Dynamic Advances's sublicensing and monetization activities. (*Id.* at 5).

Under the Amended RPI ELA, Dynamic Advances again retained the exclusive right to prosecute any infringement, though RPI retained the right to prosecute such infringement in the event Dynamic Advances elected not to. (*Id.* at 5–6). Dynamic Advances was required to "copy or blind copy RPI (as requested by RPI) on any written communications pertaining to a potential

settlement or license with a Potential Licensee" and to provide RPI at least twenty-four hours'

advance notice "of any settlement call it initiates and the right to participate on such call if

requested by RPI." (*Id.* at 4).

### D.     Marathon Restructures Its Debt in 2017

On January 10, 2017, Marathon and DBD Credit entered into an Amended and Restated

Revenue Sharing and Securities Purchase Agreement (the "Amended RSSPA") and an Amended

and Restated Patent License Agreement (the "Amended PLA"). (Dkt. No. 89-8; Dkt. No.  358-5,

at 2). In the Amended PLA, Marathon again "grant[ed]" DBD Credit a "non-exclusive,

transferable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free, and worldwide

license to the Licensed Patent[]" but, in contrast to the original PLA, did not condition this right

on any default by Marathon. (Dkt. No. 358-5, at 2). Like the original PLA, the Amended PLA

did not give DBD Credit the right to bring infringement actions; Marathon, as the "Licensor,"

retained the "sole right . . . to bring any action on account of any such infringement." (*Id.*).

However, Marathon and DBD separately agreed in the Amended RSSPA that DBD Credit "shall

only be entitled to use [the license set forth in the Amended PLA] following the occurrence of

any Event of Default." (Dkt. No. 89-8, at 12). In addition, the Amended PLA provided that that

DBD Credit, as "Licensee," could, without Marathon's consent, "assign any or all of [its] rights

and interests, and delegate any or all of their obligations without restriction." (Dkt. No. 358-5, at

3).

On August 3, 2017, Marathon and DBD Credit restructured their loan arrangement by

entering into a First Amendment to Amended and Restated Revenue Sharing and Securities

Purchase Agreement and Restructuring Agreement (the "Restructuring Agreement"). (Dkt. No.

89-9). The Restructuring Agreement amended the Amended RSSPA by removing the event-of-

default limitation on DBD's license right. (*Id.* at 6 (amending Section 2.11 of the Amended

RSSPA by providing that "the Collateral Agent [DBD Credit] (including as IP Monetization Manager) shall be entitled to use the license provided for under the [Amended PLA] without limitation . . .")).

The Restructuring Agreement also required Marathon and its subsidiaries to transfer "Designated Portfolios"—including the '798 Patent—to one or more newly created Special Purpose Entities ("SPEs"). (*See id.* at 2, 10 ("Upon the obtaining of the Required Consents, the Company shall, and shall cause its applicable Subsidiaries to, contribute and assign the Designated Portfolios to the SPE in a manner and pursuant to documentation acceptable to [DBD Credit]."), 31 (including the '798 Patent in the Designated Portfolios)). Marathon and DBD Credit agreed that the organizational documentation for the SPE and the assignment documentation for the Designated Portfolios would be "in form and substance acceptable to [DBD Credit]." (*Id.* at 10). The SPE's Operating Agreement was required to "provide for [DBD Credit] or its designee to receive the DBD Membership Interest." (*Id.*; *see id.* at 3 (defining "DBD Membership Interest" to mean "a membership interest in the SPE that provides for DBD or its designee to be the sole managing member of the SPE, including, without limitation, to be the IP Monetization Manager with respect to the Designated Portfolios held by the SPE, and that provides DBD or its designee with the right to the DBD Distributions and [Marathon] with the right to the Marathon Residual.")).

The "IP Monetization Manager" was given, "with respect to the Designated Portfolio" and "notwithstanding any other provision of the Agreement," "the sole and absolute discretion to make any and all decisions . . . relating to . . . the Patents and Monetization Activities," including "the initiation, direction, termination, conclusion or negotiation of any assignment sale or license . . . of any Patent." (*Id.* at 7; *id.* at 4 (defining "IP Monetization Manager" as "DBD or its

designee, as the sole party empowered from and after the Amendment Effective Date, to control

Monetization Activities")).

Upon completion of the restructuring contemplated by the Restructuring Agreement, "the

obligations of [Marathon] and its Subsidiaries under the [Amended RSSPA] shall be deemed to

have been exchanged for the DBD Membership Interest and to have been fully satisfied by the

completion of the Restructuring and the receipt by [DBD Credit] of the DBD Membership

Interest in the SPE." (*Id.* at 10).

### E.  **Dynamic Advances Assigns Its Interests to CF Dynamic**

The parties agree that CF Dynamic—the Plaintiff in this action—was created on October

20, 2017 to be the SPE assignee of Dynamic Advances's interest in the '798 Patent. CF

Dynamic's sole managing member is CF Marathon LLC. (*See* Dkt. No. 394-3, at 2 (Amended

and Restated LLC Agreement of CF Dynamic dated August 12, 2020 listing CF Marathon LLC

as its sole member)). CF Marathon's LLC Agreement, dated October 20, 2017, references

Marathon's contributing to CF Dynamic Advances LLC all of its "ownership rights with respect

to the [RPI] Portfolio." (Dkt. No. 312-2, at 2). CF Marathon's Class A Member, CF DB EZ,

LLC, "shall have the exclusive power and authority to manage the business, affairs and assets of

[CF Marathon] and its Subsidiaries and to make all decisions with respect thereto," including the

power and authority to make decisions relating to "the Patents and any Monetization Activities"

and licensing. (*Id.* at 12).

Also on October 20, 2017, Dynamic Advances assigned to CF Dynamic "the entire right,

title and interest held by [Dynamic Advances] under the [Amended RPI ELA]." (Dkt. No. 92-6,

at 2 (Assignment of Amended RPI ELA)). Prior to this assignment, RPI provided its written

consent. (*See* Dkt. No. 92-4, at 2 (noting that "Section 18 of the [Amended RPI ELA] provides

that the rights and obligations under the [Amended RPI ELA] may only be assigned upon written

notice to, and consent of[,] RPI" and documenting RPI's consent); *see also* Dkt. No. 92-5 (CF Dynamic "agree[ing] to assume the obligations of the Licensee, as defined in the [Amended RPI ELA]")).

## III.   STANDARD OF REVIEW

Rule 12(b)(1), which provides that a court may dismiss a claim for lack of subject matter jurisdiction, is the proper procedural route to bring a standing challenge. *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006); *see also Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016). Although Article III standing and subject matter jurisdiction "are distinct concepts," Article III standing "remains . . . a limitation on the authority of a federal court to exercise jurisdiction." *All. for Envtl. Renewal*, 436 F.3d at 88 n.6; *see also Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 594 n.2 (2d Cir. 1993). "The question of standing is not subject to waiver" and may be raised at any time. *United States v. Hays*, 515 U.S. 737, 742 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–31 (1990))).[2]

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). A defendant may make "a fact-based Rule 12(b)(1) motion,

---

[2] Indeed, Amazon previously moved to dismiss this action for lack of Article III standing based on different arguments. (*See* Dkt. Nos. 103 (report and recommendation recommending that Amazon's motion to dismiss be denied), 108 (order adopting the report and recommendation and denying the motion to dismiss)). Although the Court agreed with Amazon that "the Exclusive License could not have transferred to CF Dynamic through enforcement of DBD's security interest," (*see* Dkt. No. 108, at 5), the Court nonetheless held that CF Dynamic "was granted the Exclusive License directly" from Dynamic Advances and that this assignment was valid despite anti-assignment provisions in two *other* agreements effectuating the sale of Dynamic Advances to Marathon, (*see id.* at 5–6). Amazon's first motion to dismiss for lack of standing did not raise the issue of any sublicensing right held by DBD Credit.

proffering evidence beyond the complaint and its exhibits." *Nicholas v. Trump*, No. 18-cv-8828, 2020 WL 209274, at *3, 2020 U.S. Dist. LEXIS 6427, at *8 (S.D.N.Y. Jan. 14, 2020) (citation omitted). A plaintiff must then "come forward with evidence of [its] own to controvert that presented by the defendant, or may instead rely on the allegations in [its] [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). The "party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citation and brackets omitted).

## IV.     ANALYSIS

Amazon's arguments as to why neither Plaintiff has Article III standing have evolved over the course of its briefing. However, they may be distilled as follows: (1) the 2011 and 2016 RPI ELAs transferred RPI's substantial and exclusionary rights in the '798 Patent to Dynamic Advances, divesting RPI of Article III standing and the right to sue as patentee;[3] and (2) because DBD Credit acquired unfettered sublicensing rights from Dynamic Advances through the 2017 restructuring and licensing agreements, CF Dynamic lacked the exclusive rights necessary for standing to sue. (*See generally* Dkt. Nos. 288-1, 324, 374). Plaintiffs respond that RPI has standing to sue as the patent owner and that CF Dynamic has standing as an exclusive licensee of the '798 Patent. (*See generally* Dkt. No. 312). For the reasons that follow, the Court agrees with Plaintiffs.

---

[3] As there is no material difference between the 2011 RPI ELA and 2016 Amended RPI ELA with respect to the standing analysis, the Court has utilized the 2016 Amended RPI ELA as it was the agreement in effect at the time this action was filed.

A.        **Standing to Sue for Patent Infringement**

Article III of the Constitution provides that the judicial power of the federal courts extends only to "Cases" or "Controversies." U.S. Const. art. III, § 2. "A party must establish standing, *i.e.* show that its case or controversy is amenable to resolution by a federal court, by demonstrating that it suffers an injury which can be fairly traced to the defendant and likely redressed by a favorable judgment." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)). The plaintiff must have suffered an "injury in fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). Because "[p]atents and the rights they confer are creatures of statute," the Federal Circuit has looked to the Patent Act to determine whether a party bringing an infringement action has suffered the invasion of an interest protected by the statute. *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. 17-cv-1658, 2020 WL 7771219, at *2, 2020 U.S. Dist. LEXIS 244512, at *6 (D. Del. Dec. 30, 2020) ("[I]n a patent infringement case, the actual or threatened injury required by Article III exists solely by virtue of the Patent Act.") (citation omitted); *see also WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) ("Because the Patent Act creates the legally protected interests in dispute, the right to assert infringement of those interests comes from the Act itself."). Standing is assessed at the time an action is commenced. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1338 (Fed. Cir. 2007) ("To determine whether [a party] has standing, we must first understand its rights to the patent at the time this suit was initiated.").

The Patent Act provides that a "patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *see id.* § 100(d) (defining "patentee" to include

"not only the patentee to whom the patent was issued but also the successors in title to the patentee"). Previously, the Federal Circuit articulated "three general categories" of plaintiffs in patent infringement suits. *See Morrow*, 499 F.3d at 1339–41. The first category includes plaintiffs "that hold all legal rights to the patent as the patentee or assignee of all patent rights." *Id.* at 1339–40. Because such a plaintiff "holds all the exclusionary rights" in the patent, it "[u]nquestionably" suffers injury in fact and can sue in its own name. *Id.* ("When a party holds all rights or all substantial rights, it alone has standing to sue for infringement."). The second category includes those plaintiffs who "hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent." *Id.* at 1340. These plaintiffs, who are often identified as "exclusive licensees," are injured by infringement and therefore have Article III standing, although courts often require the joinder of the patentee "to satisfy prudential standing concerns." *Id.*[4] Finally, the third category includes those plaintiffs that "hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes to meet the injury in fact requirement." *Id.* These plaintiffs "lack constitutional standing," and this deficiency "cannot be cured by adding the patent title owner to the suit." *Id.* at 1341.

More recently, however, the Federal Circuit's decision in *Lone Star* clarified that "whether one qualifies as a patentee under 35 U.S.C. § 281 is a *statutory* prerequisite to the right to relief in a patent infringement action, but does not implicate the district court's subject matter jurisdiction." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020) (emphasis added); *see Lone Star*, 925 F.3d at 1235–36 (holding that "whether a party possesses all substantial rights in a patent does not implicate standing or subject-matter jurisdiction"); *see also Lexmark Int'l, Inc. v. Static Control Corp.*, 572 U.S. 118, 128 n.4 (2014)

---

[4] RPI and CF Dynamic proceed under this second category as patentee and exclusive licensee.

("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." (citation omitted)). Although whether a party possesses all substantial rights in a patent and is therefore a patentee entitled to sue under Section 281 is technically distinct from the Article III standing inquiry, the injury-in-fact analysis nonetheless centers around "whether the plaintiff has exclusionary rights" that have been violated. *See Uniloc USA*, 2020 WL 7771219, at *5, 2020 U.S. Dist. LEXIS 244512, at *13–14. "The Federal Circuit has stated repeatedly and unambiguously that it is the violation of the exclusionary rights that come with a patent that constitutes the injury-in-fact necessary for Article III standing in a patent infringement case." *Id.* (collecting cases). At the "core" of "the scope of a patent's exclusionary rights" is "the legal right to prevent others from practicing the asserted patent." *Id.*; *see also In re Cirba Inc.*, No. 21-cv-154, 2021 WL 4302979, at *3, 2021 U.S. App. LEXIS 28705, at *10–11 (Fed. Cir. Sept. 22, 2021) (finding it "not clear" that *Lexmark* and *Lone Star* "require us to alter our precedent holding . . . that 'the touchstone of constitutional standing in a patent infringement case is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury'" (citation omitted)).

    With these principles in mind, the Court evaluates the standing of each Plaintiff.

**B.    RPI**

    The Court first addresses Amazon's argument based on the allegations in the complaint. Amazon argues that RPI admitted in the complaint that it was no longer the patentee and that CF Dynamic had all substantial rights. (Dkt. No. 288-1, at 13). Specifically, Amazon points to Plaintiffs' allegation: "[CF Dynamic] is the exclusive licensee to the '798 Patent. As such, [RPI] has transferred all substantial rights to the '798 Patent to [CF Dynamic], including the exclusive

right to sue for infringement and recover damages for all past, present, and future infringement."
(Dkt. No. 1, ¶ 34; *see also* Dkt. No. 288-1, at 13 (Amazon arguing that RPI "admits that it has *no*
substantial rights in the patent"); Dkt. No. 324, at 8 (referring to this allegation as an
"admission[]")). Plaintiffs respond that this allegation sought "to establish CF Dynamic's 'right
to sue'" and that "whether a patent owner transferred 'all substantial rights' for ownership
purposes is a legal conclusion." (Dkt. No. 312, at 14–15 & n.3).

  The Court declines to treat the cited allegation as an admission that is binding on
Plaintiffs or determinative of RPI's standing. "A judicial admission is a statement made by a
party or its counsel which has the effect of withdrawing a fact from contention and which binds
the party making it throughout the course of the proceeding." *In re Motors Liquidation Co.*, 957
F.3d 357, 360 (2d Cir. 2020) (citations omitted). "To constitute a judicial admission, the
statement must be one of fact—a legal conclusion does not suffice." *Id.* (citation omitted).
Further, to constitute a judicial admission a statement must be "intentional, clear, and
unambiguous." *Id.* at 361. Here, the Court agrees with Plaintiffs that their allegations that RPI
"transferred all substantial rights" in the '798 Patent to CF Dynamic and that CF Dynamic is the
"exclusive licensee" are legal conclusions or, at most, mixed questions of law and fact, neither of
which qualifies as a judicial admission. *Cf. Tahirou v. New Horizon Enterprises, LLC*, No. 20-
cv-281, 2023 WL 2613506, at *7, 2023 U.S. Dist. LEXIS 49256, at *20–21 (D. Conn. Mar. 23,
2023) (finding that whether a defendant is an employer under the Fair Labor Standard Act is a
"mixed question of law and fact" and therefore not a "pure statement of fact that qualifies as a
judicial admission"); *see also In re Motors Liquidation Co.*, 957 F.3d at 362 n.1 (expressing
"serious reservations about calling a description of liabilities assumed a 'fact' rather than a legal

conclusion"). Particularly where the parties' arguments as to Plaintiffs' standing go beyond the pleadings, Plaintiffs' allegation in the complaint is not properly treated as determinative.[5]

### 1.    Whether the RPI ELAs transferred RPI's Exclusionary Rights

In the patent infringement context, the Federal Circuit has "recognized that those who possess 'exclusionary rights' in a patent suffer an injury when their rights are infringed." *Lone Star*, 925 F.3d at 1234; *see also Morrow*, 499 F.3d at 1339 (explaining that a party that "hold[s] less than all substantial rights to the patent and lack[s] exclusionary rights" "[is] not injured by a party that makes, uses, or sells the patented invention" and therefore "lack[s] constitutional standing"). A patent grant bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention. *See* 35 U.S.C. §§ 154, 271 (describing permitted and prohibited actions with respect to the exclusionary rights). Thus, "exclusionary rights" involve the ability to exclude others from practicing an invention or to "forgive activities that would normally be prohibited under the patent statutes." *Morrow*, 499 F.3d at 1342; *see Intell. Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1346 (Fed. Cir. 2001) (explaining that a "party such as IPD that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention").

In this case, under the Amended RPI ELA, RPI retains titular ownership of the '798 Patent as well as the "sole discretion" to: (1) approve potential sublicensees identified by

---

[5] Plaintiffs appear to argue that their allegations in the complaint that the inventors assigned the '798 Patent to RPI and that Amazon infringes the patent are sufficient to satisfy Article III requirements without further inquiry. (*See* Dkt. No. 312, at 12; Dkt. No. 1, ¶¶ 5, 32, 48–66); *see also Schwendimann*, 959 F.3d at 1071 (concluding that there was no "standing" issue to be decided on appeal where the complaint alleged that the plaintiff was "the owner by assignment of the [asserted] patent and [defendants] infringed that patent"). However, where a defendant makes a "fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading," the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant" if the defendant has "reveal[ed] the existence of factual problems." *Carter*, 822 F.3d at 57 (citations omitted).

Dynamic Advances; (2) consent to Dynamic Advances's granting of sublicenses to third parties; and (3) approve the "form and substance of each sublicense." (Dkt. No. 92-3, at 4). In addition, RPI retains the right to participate in setting the "Net Revenue" or "Minimum Recoveries" "applicable to each Potential Licensee," prior to Dynamic Advances's "entering into any settlement or license agreement." (*Id.*). Under the Amended RPI ELA, RPI is entitled to collect a "share of proceeds from" Dynamic Advances's sublicensing and monetization activities, (*id.* at 5), and RPI possesses the right to prosecute any infringement on its own behalf if Dynamic Advances "elects not to prosecute." (*Id.* at 6). The latter right suggests that RPI possesses the right to indulge or forgive infringement. *See, e.g.*, *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1320–21 (Fed. Cir. 2009) (explaining that although the licensee "was given the right of first refusal in suing alleged infringers, the . . . License provides that if [the licensee] elects not to exercise its right to sue, [the patent owner] has the right to bring its own infringement action," and conclude that although the licensee "has the option to initiate suit for infringement, 'it does not enjoy the right to indulge infringements'" (quoting *Abbott Lab'ys v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995))); *see also Morrow*, 499 F.3d. at 1342 (noting that "implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded").

In sum, RPI's allegations indicate that (1) under the Amended ELA, RPI retained the right to control and veto sublicensing, receive proceeds from Dynamic Advances's monetization activities, and participate it litigation and prosecute (or indulge) infringement in the event Dynamic Advances elects not to; and (2) Amazon has engaged in unlicensed use of the patented technology, (Dkt. No. 1, ¶ 1). In other words, RPI has alleged that it possesses exclusionary rights and that Amazon's unlicensed use of the patented technology infringes those rights.

Accordingly, the Court concludes that RPI has sufficiently demonstrated injury-in-fact to support Article III standing. *Morrow*, 499 F.3d at 1339 (explaining that "[c]onstitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention that violates these exclusionary rights."); *E8 Pharms. LLC v. Affymetrix, Inc.*, 680 F. Supp. 2d 292, 294 (D. Mass. 2010) ("[T]he party holding the exclusionary rights to a patent suffers constitutional injury-in-fact when another makes, uses, or sells the patented invention without his consent.)), *aff'd* 13-1046 (Fed. Cir. Nov. 6, 2013).[6]

### 2.    Whether RPI is the Patentee

As mentioned, the Patent Act provides a "patentee" with a cause of action for infringement. 35 U.S.C. § 281. "'A patent owner may transfer all substantial rights in the patents-in-suit, in which case the transfer is tantamount to an assignment of those patents to the exclusive licensee,' who may then maintain an infringement suit in its own name." *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A., Inc.*, 19 F.4th 1315, 1319–20 (Fed. Cir. 2021) (quoting *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1358–59 (Fed. Cir. 2010)). "An assignment of patent rights operates to transfer title to the patent, while a license leaves title in the patent owner." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1116–17 (Fed. Cir. 1996) (citing *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891)). Again, the question of whether a party is a "patentee" with a cause of action for infringement relates to the legal right to bring a cause of action under the Patent Act, not Article III standing. *Lone Star*, 925 F.3d at 1235–36. In any event, as Amazon has raised the issue, the Court has addressed the parties' arguments regarding whether RPI remains the owner of the '798 Patent.

---

[6] Amazon raises additional arguments concerning the legal effect of DBD Credit's "unfettered" sublicensing rights on RPI's exclusionary rights, including that the arguments that RPI is deemed to have consented to the Amended PLA and lacked authority to "block" sublicensing by DBD Credit. (Dkt. No. 324, at 9–10). The Court addresses these arguments in Section IV.C.2 *infra*.

In evaluating whether an exclusive license is "tantamount to an assignment," courts must "ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted." *Univ. of S. Fla.*, 19 F.4th at 1320 (citation omitted). The Federal Circuit has articulated the following non-exhaustive list of rights that should be considered:

> the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent.

*Id.* (quoting *Alfred E. Mann*, 604 F.3d at 1360–61). At bottom, the question is "whether a party other than the original patentee has established that it obtained all substantial rights in the patent." *Id.* (quoting *Lone Star*, 925 F.3d at 1229). The "most important considerations" are "the exclusive right to make, use, and sell, as well as the nature and scope of the patentee's retained right to sue accused infringers." *Id.* If the licensor does not transfer "all substantial rights" to the exclusive licensees, the licensor remains the owner of the patent. *Alfred E. Mann*, 604 F.3d at 1359. But if the licensor does transfer all substantial rights, the licensee effectively "becomes the owner of the patent." *Id.*

"[T]he interpretation of contracts for rights under patents is generally governed by state law. *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1327 (Fed. Cir. 2002) (citing *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)); *see also State Contracting & Eng'g Corp. v. State of Fla.*, 258 F.3d 1329, 1339 (Fed. Cir. 2001) ("Whether express or implied, a license is a contract governed by ordinary principles of state contract law.") (quotation marks omitted) (quoting *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995)).

In this case, the RPI ELA and Amended RPI ELA specifically invoke "the laws of the State of New York." (Dkt. No. 89-3, at 13; Dkt. No. 92-3, at 13).

In 2007, the '798 Patent was issued to the inventors, who assigned the '798 Patent to RPI. (Dkt. No. 1, ¶ 32); *see* Dkt. No. 89-2 (2001 assignment of all rights from the inventors to RPI). In 2011, RPI granted Dynamic Advances an exclusive license to the '798 Patent, (*see* Dkt. No. 89-3 (RPI ELA), and in 2016, RPI and Dynamic Advances entered an Amended RPI ELA that is, as relevant here, identical in all material respects, (Dkt. No. 92-3). Thus, to determine what rights RPI retained following its grant of an exclusive license to Dynamic Advances, the Court looks to the terms of the Amended RPI ELA. (Dkt. No. 92-3).

Under the Amended RPI ELA, and by virtue of Dynamic Advances's subsequent assignment of its rights to CF Dynamic, CF Dynamic has an exclusive license to the '798 Patent and the exclusive right "to grant sublicenses to third parties." (*Id.* at 3–4). CF Dynamic, as licensee, also has "the exclusive right to prosecute any and all infringements of any RPI Patent Rights." (*Id.* at 5). Although RPI transferred these important rights, as described above, RPI nonetheless retained significant rights in the '798 Patent. *See supra* Section IV.B.1.

The Court concludes that RPI retained sufficient rights in the '798 Patent, including veto power over potential sublicensees and the right to sue for patent infringement if CF Dynamic elects not to, such that the Amended RPI ELA did not constitute an assignment by transferring *all* substantial rights to CF Dynamic. In *Alfred E. Mann*, for example, the Federal Circuit found that the plaintiff remained the owner of the patents-in-suit even though the licensee was granted the exclusive right to sue for infringement. 604 F.3d at 1361–63. If the licensee chose to file suit, it controlled the litigation but was required to keep the patent owner informed, and the patent owner was allowed to participate in the litigation. *Id.* at 1361. If the licensee chose not to file

20

suit, however, the patent owner had the right to initiate litigation; if it did so, it controlled the

litigation. *Id.* In either case, any proceeds of litigation were to be shared between the parties. *Id.*

The Federal Circuit found that the licensor, AMF, remained the patentee, noting:

> While AMF's right to choose to sue an infringer does not vest until
> AB chooses not to sue that infringer, it is otherwise unfettered. Once
> its right to sue an infringer activates, AMF can decide whether or
> not to bring suit, when to bring suit, where to bring suit, what claims
> to assert, what damages to seek, whether to seek injunctive relief,
> whether to settle the litigation, and the terms on which the litigation
> will be settled.

*Id.* at 1362. "Such a broad right to decide whether to bring suit and to control litigation is

thoroughly inconsistent with an assignment of the patents-in-suit." *Id.*[7] Similarly, here, once

RPI's right to prosecute infringement "activates," RPI has the sole discretion to decide whether

to bring suit and maintains control over that litigation.[8] Any recovery RPI obtains is its sole

property. And, even when CF Dynamic elects to prosecute infringement, the parties agree to

"cooperate" with each other and RPI retains control over CF Dynamic's settlement amounts.

The conclusion that RPI did not transfer all substantial rights in the '798 Patent to CF

Dynamic is supported by other Federal Circuit caselaw. *See, e.g.*, *Sicom*, 427 F.3d at 979

---

[7] Amazon argues that Plaintiffs' reliance on *Alfred E. Mann* is misplaced because there the patent owner retained the right to sue in only some circumstances, which included the circumstances of the subject lawsuit. (Dkt. No. 324). However, Amazon quotes the Federal Circuit's summary of the parties' arguments, not the court's holding. *See Alfred E. Mann*, 604 F.3d at 1361 ("AMF argues that its rights are substantial, allowing suit in at least some circumstances, including the circumstances of this case."). Elsewhere, the Federal Circuit has rejected a "focus on the parties [or circumstances] in suit" because it is "the intention of the parties to the [license] [a]greement and the substance of what was granted [which] are relevant factors in determining whether all substantial rights in a patent were conveyed." *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 979 (Fed. Cir. 2005).

[8] Amazon also argues that RPI's retained right to sue is illusory in light of DBD Credit's purported sublicensing right. (*See* Dkt. No. 324, at 7–8, 11). However, for purposes of determining whether the Amended RPI ELA amounted to an assignment and not just an exclusive license, the focus is on the Amended RPI ELA itself and what rights were transferred and retained. The Court further concludes that RPI's right to sue is not illusory under the Amended RPI ELA, given that CF Dynamic's sublicensing right was subject to RPI's prior written approval and the parties agreed to cooperate in litigation proceedings. *Cf. Alfred E. Mann*, 604 F.3d at 1362 (concluding that the licensor's retained right to sue was not illusory because the any sublicense granted by the licensee "must include specified pass-through royalties" and the licensee's right to sublicense was therefore "fettered"); *Fujifilm*, 19 F.4th at 1322 (rejecting argument that retained right to sue was illusory because "the patent owner and licensee are required to cooperate in enforcement of the [asserted] patent").

(finding that licensee-plaintiff failed to show that it held all substantial rights under the patent where, among other things, it did not have the right to "settle litigation without the prior written consent from [the owner]" or to "sublicense without [the owner's] prior approval"). Although Amazon cites *Morrow* for the proposition that a patent owner lacks standing to sue for infringement where it has "contractually separated the right to sue" from its ownership rights, (Dkt. No. 324, at 5), that case is distinguishable. *Morrow* decided whether a party who was *not* the owner of the asserted patent had standing to sue. 499 F.3d at 1338 (determining whether plaintiff GUCLT had standing and noting that it was "undisputed that AHLT holds legal title" to the asserted patent). The Federal Circuit ultimately determined that the plaintiff failed to meet Article III constitutional standing requirements, *id.* at 1344, but did not expressly determine whether the patent owner had standing to sue.

Accordingly, the Court concludes that RPI did not transfer all substantial rights to CF Dynamic and remains the patentee of the '798 Patent.

### C.    CF Dynamic

Amazon argues that CF Dynamic lacks constitutional standing to sue for infringement because, at the time this action was commenced, DBD Credit enjoyed the unfettered right to grant sublicenses and CF Dynamic therefore had no exclusionary right in the '798 Patent. (*See generally* Dkt. No. 288-1). Plaintiffs respond that CF Dynamic has standing as the exclusive licensee of the '798 Patent because: (1) "any sublicense that Dynamic Advances purported to grant DBD Credit was invalid . . . because Dynamic Advances failed to obtain RPI's consent to that sublicense"; (2) Dynamic Advances could not grant DBD greater licensing rights than Dynamic Advances itself received from RPI, "any sublicenses granted by DBD . . . would also be subject to RPI's veto"; and (3) DBD Credit's sublicensing right was "eliminated once CF Dynamic was created" and assigned Dynamic Advances's rights under the Amended RPI ELA.

(Dkt. No. 355, at 9; Dkt. No. 312, at 18–20).[9] In reply, Amazon maintains that the Amended

PLA gave DBD Credit an unfettered sublicensing right and that, in any event, RPI is deemed to

have consented to the Amended PLA. (Dkt. No. 324, at 9; Dkt. No. 374, at 13–17).

### 1.      Transfer of Rights

To begin, those who "possess 'exclusionary rights' in a patent suffer an injury when their

rights are infringed." *Lone Star*, 925 F.3d at 1234 (quoting *WiAV*, 631 F.3d at 1264–65).

Exclusionary rights "involve the ability to exclude others from practicing an invention or to

'forgive activities that would normally be prohibited under the patent statutes.'" *Id.* (quoting

*Morrow*, 499 F.3d at 1342). Because an exclusive licensee "derives its standing from the

exclusionary rights it holds," its standing "will ordinarily be coterminous with those rights."

*WiAV*, 631 F.3d at 1266. For example, an exclusive licensee "lacks standing to sue a party who

has the ability to obtain such a license from another party with the right to grant it" because, in

such a case, "the exclusive licensee does not have an exclusionary right with respect to the

alleged infringer and thus is not injured by that alleged infringer." *Id.* A party has "the ability to

obtain" a license from another party so long as the other party has "the legal right to grant the

[party] a license." *ChromaDex, Inc. v. Elysium Health, Inc.*, 507 F. Supp. 3d 579, 584–85 (D.

Del. 2020) (rejecting the argument that a party has the ability to obtain a license from a third

party with the right to grant it only if that third party "would have been willing" to grant a

license).

In this case, the relevant agreements are the Amended RPI ELA, in which RPI granted

Dynamic Advances an exclusive license under the '798 Patent, and the Amended PLA, in which

---

[9] Although DBD Credit and CF Dynamic executed a Termination Agreement on February 14, 2023, terminating "any licensing rights held by DBD," (Dkt. No. 358-4, at 2), it is undisputed that such an agreement cannot give CF Dynamic retroactive standing.

Dynamic Advances[10] purported to grant DBD Credit a non-exclusive, "sub-licensable," license in the '798 Patent. (Dkt. Nos. 92-3, 358-5). Like the Amended RPI ELA, the Amended PLA specifies that it "shall be governed by" the "laws of the State of New York."[11] (Dkt. No. 358-5, at 5). Notably, Plaintiffs do not appear to contest that, if DBD Credit had the unfettered right to sublicense the '798 Patent to Amazon, CF Dynamic would lack an exclusionary right with respect to Amazon and therefore would lack constitutional standing to sue for infringement. Nor do Plaintiffs contest that the Amended PLA, by its terms, appears to give DBD Credit an unfettered sublicensing right. (*See* Dkt. No. 358-5, at 2 (granting to "Licensee a non-exclusive, transferrable, sub-licensable, divisible, full paid-up, royalty-free, and worldwide license to the" '798 Patent)).

Rather, Plaintiffs assert that because RPI's consent to the Amended PLA granting DBD Credit a sublicense was never obtained, the Amended PLA is invalid. Amazon acknowledges

---

[10] Although the Amended PLA identifies the licensor as Marathon, not Dynamic Advances, because there is no dispute Marathon, which had acquired Dynamic Advances, was acting for Dynamic Advances, the Court uses Dynamic Advances instead of Marathon in order to avoid confusion. Further, although the present motion challenges CF Dynamic's standing, there is little discussion of CF Dynamic; the majority of the discussion concerns the sublicensing rights Dynamic Advances granted to DBD Credit in the Amended PLA. Amazon asserts that when Dynamic Advances assigned its rights (i.e., the Amended RPI ELA) to CF Dynamic, DBD Credit still held an unfettered right to grant a sublicense to anyone, including Amazon. Amazon therefore argues that although CF Dynamic, by virtue of the assignment, may have been RPI's "exclusive licensee" at the time this action was commenced, CF Dynamic had no exclusionary rights with respect to Amazon. Thus, although CF Dynamic was not named in the Amended RPI ELA or Amended PLA, the Court must evaluate those agreements in order to determine whether DBD Credit acquired an unfettered sublicensing right that may have undermined the exclusionary rights CF Dynamic received through the subsequent assignment.

[11] Likening the present circumstances to the rare instances when courts have applied federal law, not state law, to contractual issues in patent cases, *see, e.g.*, *Rhone Poulenc*, 284 F.3d at 1328 (addressing the impact of a licensee's fraud upon the validity of a sublicensee granted to a bona fide purchaser and observing that both the interpretation of patent license contract and the impact of fraud on such contracts is "generally governed by state law," but concluding in light of "the important of having a uniform national rule," that the "bona fide purchaser defense to patent infringement is a matter of federal law"); *Unarco Indus., Inc. v. Kelley Co., Inc.*, 465 F.2d 1303, 1306 (7th Cir. 1972) ("The long standing federal rule of law with respect to the assignability of patent license agreement provides that these agreements are personal to the licensee and not assignable unless expressly made so in the agreement."), Plaintiffs argue that the "need for a uniform national rule that patent licensees cannot grant valid sublicenses unless they comply with an agreement authorizing them to do so." (Dkt. No. 355, at 13–14). The Court finds no basis for concluding there is such a need in this case.

that "a transfer that violates a consent provision may be ineffective if the consent provision expressly voids such transfers," but argues that the Amended PLA is valid because it did not expressly void such transfers,  (Dkt. No. 324, at 10 (citing *Au New Haven, LLC v. YKK Corp.*, 210 F. Supp. 3d 549, 554–55 (S.D.N.Y. 2016)), and that RPI would possess, "[a]t most," a claim for damages against Dynamic Advances for breaching the Amended RPI ELA. (Dkt. No. 374, at 18).

Under New York law, where a contract prohibits assignments without the written consent of the parties, "it has been consistently held that assignments made in contravention of [a consent provision] are void if the contract contains clear, definite and appropriate language declaring the invalidity of such assignments." *Sullivan v. Int'l Fid. Ins. Co.*, 465 N.Y.S.2d 235, 238 (App. Div. 1983) (citing *Allhusen v. Caristo Const. Corp.*, 303 N.Y. 446 (1952)). "On the other hand, where the language employed constitutes merely a personal covenant against assignments, an assignment made in violation of such covenant gives rise only to a claim for damages against the assignor for violation of the covenant." *Id.*; *see, e.g., Au New Haven*, 210 F. Supp. 3d at 554–55 (rejecting the defendants' argument that Au New Haven's assignment of the patent was void because Au New Haven, in failing to obtain the defendant's consent, made the assignment in violation of the licensing agreement's anti-assignment provision, explaining that the assignment was enforceable because the anti-assignment provision did not expressly provide assignments without consent were void).

As relevant here, the Amended ELA gives Dynamic Advances the right to grant sublicenses "provided RPI's written consent, which shall be in the sole discretion of RPI, is first obtained" and states that Dynamic Advances may only assign the agreement "with the written consent of RPI." (Dkt. No. 92-3, at 4, 13). Thus, the Amended RPI ELA does not appear to

contain language expressly voiding sublicenses or assignments made without RPI's consent. However, as Plaintiffs note, the principles on which Amazon relies and the cases Amazon cites do not concern sublicenses: they "concern state-law restrictions on assignment of contracts or property" (Dkt. No. 355, at 24). And in this case, there is no contention that Dynamic Advances *assigned* its rights to DBD Credit; it is undisputed that Dynamic Advances granted DBD Credit a non-exclusive sublicense. Moreover, the above cases solely concern whether, under New York law, an assignment made in contravention of a consent provision is valid; they say nothing that supports a conclusion that a party can transfer or assign *more rights* than it possessed under the original agreement. There was no argument, for example, in *Au New Haven*, that in assigning the patent at issue without consent, Au New Haven attempted to assign more rights than it possessed in the patent. 210 F. Supp. 3d at 554–56; *see also Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1333 (Fed. Cir. 2009) ("Black letter contract law states that the assignment of a contract to an assignee . . . only changes the obligated party, not the scope of the obligation.").

Undeterred, Amazon argues that because both state and federal law distinguish between contractual rights and contractual obligations, Dynamic Advances transferred its sublicensing *rights* to DBD Credit, but not its consent *obligations*. (Dkt. No. 374, at 19–20 (arguing that "a party may transfer its rights to a licensed patent without transferring the obligations set forth in a license agreement" (citing *inter alia Belge v. Aetna Cas. & Sur. Co.*, 334 N.Y.S.2d 185, 188 (App. Div. 1972); *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372–73 (Fed. Cir. 2008))). Thus, Amazon argues that the Amended PLA transferred to DBD Credit the sublicensing *rights* of Dynamic Advances under the Amended ELA, but did not bind DBD Credit to Dynamic Advances's *obligation* to obtain RPI's consent in connection with sublicensing activities. Again, assuming the applicability of assignment law to a sublicense, the

Court recognizes that under New York law "it is well settled . . . that the assignee of rights under a bilateral contract does not become bound to perform the duties [or obligations] under that contract unless he expressly assumes to do so." *Sillman v. Twentieth Century-Fox Film Corp.*, 3 N.Y.2d 395, 402 (1957). In *Kaufman v. William Iselin & Co.*, for example, the First Department explained that "the mere assignment of an invoice and of the merchandise covered thereby for purposes of securing a loan made by a commercial banker is not a situation in which it may be said that it was the intention of the parties that the [banker] should assume performance of the basic contract." 74 N.Y.S.2d 23, 26 (App. Div. 1947). The First Department therefore denied the buyer's motion to compel the banker to arbitrate a dispute regarding defective goods, explaining that absent the banker's express assumption of the contract of sale between the buyer and seller (which obligated the parties to arbitrate any dispute), the seller's assignment of invoices and merchandise to the banker as security did not carry with it, as a matter of law, an assignment of the underlying contract between the buyer and the seller. *Id.* at 24, 26.

But Amazon's argument fails because the Amended RPI ELA's sublicensing consent requirement is not a duty or obligation: it is a right. More specifically, it is one of the rights in the "bundle of [patent] rights" that RPI possessed as patentee and which it could "divide[] and assign[], or retain[] in whole or part." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991). Indeed, the grant of a patent is, at its heart, the grant of the right to exclude others from using the patent. *See Morrow*, 499 F.3d at 1339 (explaining that "[t]he right to exclude is the legal interest[,] created by statute," belonging originally to "the patentee to whom the patent was issued," and "bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention" (citing 35 U.S.C. § 154; 35 U.S.C. § 271)). Moreover, courts routinely discuss the scope of a licensee's right to sublicense as

well as the licensor's ability to "supervise and control the licensee's activities," not as duties or obligations, but as rights that a patentee or licensor originally possesses and as rights with which they may choose to part. *Alfred E. Mann*, 604 F.3d at 1360–61 (listing "some of the rights" relevant to gauging the extent to which an licensor has transferred "sufficient rights to render an exclusive licensee the owner of a patent," for purposes of standing, including "the exclusive right to make, use, and sell products or services under the patent," as well as "the scope of the licensee's right to sublicense . . . the ability of the licensor to supervise and control the licensee's activities . . . and the nature of any limits on the licensee's right to assign its interests in the patent").

In this case, RPI never parted with the right to control sublicensing. Indeed, the Amended RPI ELA's sublicensing consent requirement sets a clear limit on the scope of the sublicensing rights Dynamic Advances received from RPI: Dynamic Advances could only sublicense with RPI's consent. Further, the Amended ELA's sublicensing consent requirements are significant in sense that they enable RPI to withhold consent on any ground, (Dkt. No. 92-3, at 4 (providing that RPI's written consent "shall be in the sole discretion of RPI")), and thus illustrate the restricted scope of the sublicensing rights Dynamic Advances received under the agreement. *Compare Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007) (finding the licensor's "right to veto any transfer of [the licensee's] rights under the agreement . . . particularly significant, the more so because the agreement expressly indicates that [the licensor] is free to veto any such transfer decision, even if it does so 'arbitrarily'"); *with Speedplay, Inc. v. Bepop, Inc.*, 211 F.3d 1245, 1252 (Fed. Cir. 2000) (finding that the "consent requirement [did]

not significantly restrict the scope of [the plaintiff's] rights in the . . . patent" where the patent

owners' consent to assignment could not be withheld unreasonably).[12]

Accordingly, because the consent requirement is a limitation on the *rights* Dynamic

Advances received from RPI, and because a licensee cannot transfer and a sublicensee cannot

acquire greater rights than a licensee possesses, Dynamic Advances did not possess an unfettered

right to sublicense and it could not transfer such a right to DBD Credit.[13]

Amazon's additional arguments to the contrary are unavailing. To the extent Amazon

cites *Datatreasury*, 522 F.3d 1372–73, that case is readily distinguishable. There, the Federal

Circuit explained that because the patent license agreement's arbitration clause was a

"procedural term[] of a licensing agreement unrelated to the actual use of the patent"—as

opposed to a "legal encumbrance[] deemed to 'run with the patent'" that "involved the right to

use the patented product"—the patent assignee was not bound by the original patent license

agreement's arbitration clause. *Id.* As discussed, in this case, the consent requirements in the

Amended RPI ELA mark the boundaries on the scope of Dynamic Advances's right to

sublicense and are a legal encumbrance on Dynamic Advances's right to sublicense the '798

Patent. The Court finds no resemblance between a sublicensing consent provision that limits the

---

[12] Both *Propat* and *Speedplay* discussed the right to veto in the context of standing and the possession of substantial rights and not in the context of distinguishing contractual rights from obligations. The Court nevertheless finds these cases to be instructive as they concern the nature of scope of patent rights generally. Neither party cites caselaw, nor is the Court aware of any that would undermine the proposition that patent rights, which are, at their core, rights of exclusion, are distinguishable from contractual rights.

[13] *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1382 (Fed. Cir. 2000) ("[A]n owner or licensee of a patent cannot convey that which it does not possess."); *Innovus Prime, LLC v. Panasonic Corp.*, No. 12-cv-00660, 2013 WL 3354390, at *7, 2013 U.S. Dist. LEXIS 93820, at *22 (N.D. Cal. July 2, 2013) ("Innovus did not acquire the right to sue Panasonic under the '350 Patent because neither Philips nor any later assignee could 'convey what [it] does not own.'" (quoting *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009)); *see also WiAv*, 631 F.3d at 1268 ("Because [licensee] cannot have greater rights than its licensor, [licensee] cannot license the Defendants to engage in the conduct that forms the basis of the underlying infringement action."); *L.L. Brown Paper Co. v. Hydroiloid, Inc.*, 118 F.2d 674, 677 (2d Cir. 1941) ("The assignee of a patent taking title subsequent to the granting of a license under patent receives no more than the former owner's interest, including the usual rights of a patent owner diminished by the licensee's right to use the patented process within scope of its license.").

scope of a licensee's right to sublicense and a licensee's procedural obligation to arbitrate disputes with the original licensor. The Court therefore concludes that *Datatreasury* does not provide a basis for finding that the consent provisions were a procedural obligation separate from patent rights and that DBD Credit acquired an unfettered right to sublicense.

For all of the above reasons, the Court concludes that because Dynamic Advances never possessed an unfettered sublicensing right, it could not convey to DBD Credit, and DBD Credit never acquired, an unfettered sublicensing right.

### 2.    Consent

Amazon also argues that it is immaterial whether Dynamic Advances could transfer an unfettered sublicensing right because "RPI is deemed to have consented to DBD Credit's sub-licensing by failing to object to the [Amended] PLA within five days." (Dkt. No. 374, at 13). This consent, Amazon continues, gave DBD Credit an unfettered sublicensing right, thereby depriving RPI and CF Dynamic, as assignee of the Amended RPI ELA, of Article III standing. (*Id.*). Amazon's argument is without merit.

Section 3.2 of the Amended RPI ELA provides, in relevant part: "RPI grants to Licensee the exclusive right to grant sublicenses to third parties . . . provided RPI's written consent, which shall be in the sole discretion of RPI, is first obtained." (Dkt. No. 92-3, at 4). There is no evidence that RPI provided written consent to Dynamic Advances to grant a sublicense to DBD Credit. Amazon argues, however, that the absence of written consent is of no consequence because section 3.4 of the Amended RPI ELA *deems* RPI to have consented to the "form and substance of each sublicense" if "Licensee has not received RPI's approval or rejection" within "five (5) business days after notice thereof has been provided to RPI." *Id.* "Regarding notice, the Amended RPI ELA states that: "Any notice . . . required to be given to either party shall be deemed to have been properly given and to be effective (a) on the date of delivery if delivered in

person, (b) five (5) days after mailing, if mailed by first-class certified mail." (*Id.* at 12). Although there is no evidence in the record that RPI received "properly given" notice of the "form and substance" of the Amended PLA in accordance with the notice procedure articulated in the Amended RPI ELA, Amazon argues that there is "ample evidence" that RPI had notice of the Amended PLA "at a minimum—more than three years ago" and "consented when it failed to object within five days." (Dkt. No. 374, at 16–17 (noting that "RPI publicly filed a copy of the [Amended] PLA in this case on October 28, 2019)).[14]

However, section 3.4 of the Amended RPI ELA solely concerns the "form and substance" of a sublicense, thus even if the formal notice requirements are set aside, at best, RPI could be deemed to have consented to the "form and substance" of the proposed sublicense. Unlike section 3.4, section 3.2, which governs the "right to grant sublicenses," expressly requires "written consent" and does not identify any circumstances under which RPI may be deemed to have consented. As Plaintiffs note, even if "RPI's silence [could] be 'deemed' consent . . . with respect to a sublicense's 'form and substance,'" RPI's silence cannot be deemed to be consent to "the grant of a sublicense itself," because unlike the "form and substance" provision, the grant of a sublicense provision "does not allow any alternative to actual 'written consent.'" (Dkt. No. 355, at 10, 17) (emphasis omitted). Moreover, the caselaw Amazon cites in support of the proposition that "'strict compliance with contractual notice provisions need not be enforced' when the contracting party has received actual notice and identifies no prejudice from the alleged lack of strict compliance," concerns the issue of notice, (Dkt. No. 374, at 17 (citing, *inter alia*, *Suarez v. Ingalls*, 732 N.Y.S.2d 380, 381 (App. Div. 2001))), but does not support the additional

---

[14] Amazon argues that there is evidence that RPI had notice "of DBD Credit's sublicensing rights" as early as 2017, when RPI's General Counsel signed a document referencing the Restructuring Agreement, which, in turn, discusses the Amended PLA. (Dkt. No. 374, at 16).

proposition that "written consent" provisions need not be strictly enforced. Indeed, Amazon cites

no caselaw in support of the latter proposition.

Finally, Amazon argues that because the absence of RPI's consent is essential to

Plaintiffs' standing, it is their burden to provide "definitive evidence that RPI withheld consent

to the DBD sublicense," and they have failed to do so. (Dkt. No. 374, at 15). Specifically,

Amazon asserts that RPI's Rule 30(b)(6) witnesses failed to adequately establish that RPI never

consented to the relevant agreements. (Dkt. No. 374, at 14 (citing Dkt. No. 272-12 (Brown Dep.

Tr. at 193:13–194:8, 197:21–198:11)). Amazon further asserts that RPI "made an intentional

decision to *avoid* investigating the facts essential to Plaintiffs' standing," despite Amazon's

specific requests for information about "such facts." (*Id.* at 14–15).

Amazon's arguments are unavailing. Not only is there an extensive discovery and

litigation history between the parties in this case but there are no motions to compel further

discovery or otherwise challenging any party's intentional withholding of evidence. The Court

therefore finds no basis on which: to order further discovery, *cf.*, *e.g.*, *APWU v. Potter*, 343 F.3d

619, 627 (2d Cir. 2003) ("[W]e think it clear that plaintiffs had ample opportunity to uncover and

present evidence relating to the events bearing on the jurisdictional question, and that the district

court acted within its discretion in declining to grant further discovery."); or to draw, as Amazon

appears to request, an adverse inference against Plaintiffs finding, as a matter of fact, that RPI

consented to the DBD Credit sublicense. There is no evidence or assertion in the record before

the Court that indicates that RPI gave Dynamic Advances "written consent" to grant a sublicense

to DBD Credit, or that notice requisite to deeming RPI to have consented to the "form and

substance" of the of the Amended PLA was ever "properly given" to RPI. *See id.* ("[W]here

jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues

of fact by reference to evidence outside the pleadings, such as affidavits." (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999))). Thus, having considered the notice and consent provisions in the Amended ELA, as well as the present factual record, the Court finds no basis for concluding that RPI consented to the Amended PLA.

To summarize, the Court concludes that to the extent DBD Credit received sublicensing rights through the Amended PLA, those rights were no greater than Dynamic Advances's rights and thus did not dilute or divest the exclusionary rights RPI, Dynamic Advances, or CF Dynamic as assignee, held in light of the Amended RPI ELA. Accordingly, CF Dynamic retained sufficient rights in the '798 Patent to support Article III standing. Further, having determined that RPI's exclusionary rights remained intact following the Amended PLA, and that DBD Credit did not acquire an unfettered right to sublicense, the Court need not address whether RPI could "block DBD Credit's sublicensing," (Dkt. No. 324, at 10), or determine when DBD Credit's sublicensing rights were terminated.[15]

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Amazon.com, Inc.'s motion to dismiss for lack of Article III standing (Dkt. No. 288) is **DENIED**.

**IT IS SO ORDERED.**

Dated:  September 15, 2023
           Syracuse, New York

*Brenda K Sannes*

Brenda K. Sannes
Chief U.S. District Judge

---

[15] There is no argument that any aspect of the Amended PLA other than DBD Credit's purportedly unfettered, ongoing, right to sublicense, interfered with Plaintiffs' Article III standing in this case.